UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

GENERAL DRIVERS, WAREHOUSEMEN &
HELPERS, LOCAL UNION NO. 89              PLAINTIFF

v.                     CIVIL ACTION NO. 3:12-CV-362

JACK COOPER TRANSPORT COMPANY             DEFENDANT

**MEMORANDUM OPINION**

   Plaintiff General Drivers, Warehousemen and Helpers, Local Union No. 89 ("Local 89") and defendant Jack Cooper Transport Company ("Jack Cooper") are parties to the National Master Automobile Transporters Agreement ("NMATA"). The NMATA provides that a National Automobile Transporters Joint Arbitration Committee ("NATJAC") shall settle certain grievances under the agreement. Local 89 filed two grievances against Jack Cooper concerning the rates paid to Jack Cooper employees for certain loads (referred to as "traffic" or "hauls" under the NMATA). On May 7, 2012, the NATJAC issued a decision in connection with those two grievances. Local 89 brings this action seeking to vacate the decision. The sole claim is for breach of contract pursuant to section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Jack Cooper has moved to dismiss Local 89's second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (DN 25). That motion will be granted and this action will be dismissed, as this is not one of the rare cases in which a court may vacate a labor-arbitration decision.

   We begin with a review of the relevant NMATA provisions before turning to the factual allegations and the NATJAC decision. Article 7 of the NMATA relates to the process for resolving

grievances. Section 7(a) of the Article sets forth the function of the NATJAC, which includes settling disputes and grievances "[i]nvolving interpretations of, or disputes over, the provisions of the [NMATA]." Section 8 states, "It is agreed that all matters pertaining to the interpretation of any provision of this [NMATA], whether requested by the Employer or the Local Union, must be submitted to the [NATJAC] for decision." Section 8 also states that decisions of the NATJAC "shall be final and binding on the Employer, the Local Union and the employees."

Article 22 of the NMATA relates to a concept called "new business." Section 1 of Article 22 states that the "new business" concept was adopted "in an effort to secure additional traffic previously unavailable to the bargaining unit." The rates paid by employers for hauling "new business" traffic are less than those paid for traffic that is not classified as such (DN 30, Second Am. Comp. ¶ 15). Under Section 1, traffic cannot qualify as "new business" if it has "been handled by a Teamster represented employer or entity for one (1) year" or if it "has been handled by any Teamster represented employer during the term of th[e] [NMATA]." Section 7 of Article 22 states,

> Prior to implementation of any 'new business' haul(s), the Employer(s) shall meet with the Local Union(s) affected and provide such specific information to the involved Local Union(s) regarding the nature and details of its contract with the shipper as is necessary to establish that the traffic is to be considered "new business" within the meaning of this Article and is permanent.

Section 8 of Article 22 requires disputes arising under the "new business" provisions to be subject to the NATJAC.

Local 89 filed two grievances against Jack Cooper on behalf of employees Garry Maddox and Milton Bowens on November 23, 2011 and January 24, 2012 (DN 30, Second Am. Comp. ¶ 12). The grievances alleged that Jack Cooper improperly paid the reduced "new business" rate for certain business it purportedly obtained in or around December 2009 (*id.* ¶¶ 12, 17-19). Local 89 alleges

that it asserted throughout the grievance process that Jack Cooper failed to properly advise Local 89 that the traffic in question was "new business" traffic (*id.* ¶ 17). Local 89 further asserted during the grievance process that the hauls could not be considered "new business" because the employees had hauled that traffic since approximately December 2009, meaning that the traffic had been handled by a Teamster represented employer for over one year and during the term of the NMATA (*id.* ¶ 18).

On May 7, 2012, the NATJAC issued a decision on the two grievances filed by Local 89. The decision found that Jack Cooper "failed to establish that the Local Union had been provided with the list of counties purported to have been obtained in December 2009 prior to the time that the grievance in this case were filed." Accordingly, the NATJAC stated, "the pay claims of the grievants for the four specific trips are upheld." The NATJAC continued:

> However, given the fact that the list has now been provided, and given the evidence presented by [Jack Cooper] supporting its claim that is has been paying Article 22 rates on traffic to this same group of counties, and no evidence presented to reflect that full contractual rates have been paid on any of this traffic, trips into those counties listed in Company Exhibit A4 are now to be considered new business trips within the meaning of Article 22.

Local 89 claims that the NATJAC decision "fails to draw its essence from the NMATA" and that NATJAC "dispensed its 'own brand of industrial justice' rather than properly interpreting and applying the plain language of the [agreement]" (DN 30, Second Am. Comp. ¶ 21).

Upon a motion to dismiss for failure to state a claim, a court "must construe the complaint in the light most favorable to plaintiff" and "accept all well-pled factual allegations as true." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive a motion to dismiss, the "complaint must contain either direct or inferential allegations respecting all material elements" of the offense. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir.

2009) (internal question marks omitted). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Rule 8 requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must provide more than "labels and conclusions," *Twombly*, 550 U.S. at 555, or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Accordingly, a court considering a motion to dismiss can begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

In *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504 (2001), the Supreme Court set forth the following explanation of the scope of judicial review of an arbitration decision made pursuant to a collective bargaining agreement:

> Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. We recently reiterated that if an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable.

*Garvey*, 532 U.S. at 509 (quoting *E. Assoc. Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000) and *Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

In *Michigan Family Resources, Inc. v. Service Employees International Union Local 517M*, 475 F.3d 746 (6th Cir. 2007), the Sixth Circuit considered the meaning of that standard. It offered up a three-question test for determining whether a court should vacate an arbitrator's decision: (1)

"Did the arbitrator act 'outside his authority' by resolving a dispute not committed to arbitration?"; (2) "Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award?"; or (3) "[I]n resolving any legal or factual disputes in the case, was the arbitrator 'arguably construing or applying the contract'?" *Michigan Family Res.*, 475 F.3d at 753. The Sixth Circuit explained that as long as the arbitrator did not offend any of those three requirements, then a court should decline to vacate the arbitrator's decision "even though the arbitrator made 'serious,' 'improvident,' or 'silly' errors in resolving the merits of the dispute." *Id.* The Sixth Circuit further explained that under such a standard, "judicial consideration of the merits of a dispute is the rare exception. *Id.* Indeed, it was only when an arbitration was "so 'ignor[ant]' of the contract's 'plain language' as to make implausible any contention that the arbitrator was construing the contract." *Id.* (quoting *Misco*, 484 U.S. 29, 38 (1987)).

Applying those standards here, the court finds that the second amended complaint fails to state a claim. As an initial matter, pursuant to the *Twombly/Iqbal* standard, the court will ignore the allegations in the complaint that simply state legal conclusions, such as the assertion that the NATJAC decision "fails to draw its essence from the NMATA" and that NATJAC "dispensed its 'own brand of industrial justice' rather than properly interpreting and applying the plain language of the CBA" (DN 30, Second Am. Comp. ¶ 21).

Setting aside those conclusory allegations, the remaining factual allegations provide no basis for determining that the NATJAC overstepped its bounds in such a way that would render judicial intervention appropriate. Local 89 argues that judicial intervention is warranted because NATJAC's decision is "so untethered to" the plain language of the NMATA that it does not constitute an interpretation of the agreement (DN 26, Resp. to Mot. to Dismiss at 10-11 (quoting *Michigan Family*

*Res.*, 475 F.3d at 753)). The court disagrees that the NATJAC decision is so far afield from the language of the NMATA that there is no reasonable argument that the NATJAC was construing the terms of the agreement. Local 89 put forth an intricate argument to the NATJAC that, based on the language of the NMATA, what could have been "new business" loads in December 2009 had Jack Cooper provided the union proper notice under the NMATA at that time could no longer be considered "new business" loads once Jack Cooper's own employees had handled the loads for one year. NATJAC found instead that, while the failure to provide proper notice precluded Jack Cooper from paying the reduced "new business" rate for loads previously handled by Jack Cooper's employees, it did not change the fact that those loads qualified under the NMATA as "new business" and thus Jack Cooper could pay the reduced price once proper notice was provided, even if the notice was provided over one year after Jack Cooper's employees began handling that traffic. In other words, NATJAC found that, under Article 22, "new business" was defined as of the time it was acquired by the company, not the time proper notice was given, even though proper notice had to be given in order for the company to pay the reduced rates.

It would be improper for this court to make its own determination as to the correctness of the NATJAC's conclusion. Instead, it is enough for the purposes of resolving this matter that NATJAC's decision was, at the very least, arguably an interpretation of the terms of the NMATA. The court notes that the NMATA can hardly be said to clearly address such a situation; thus, it is impossible to state that NATJAC's decision is contrary to the plain words of the Article. The court further notes that the definition of "new business" is provided in Section 1 of Article 22, while the notice requirement is set forth in a separate section, Section 7. The court does not make that observation in order to show that NATJAC's interpretation of the NMATA was correct; it provides

that observation only to show that NATJAC's decision was not so unmoored from the wording of the NMATA that NATJAC only could have been "dispens[ing] [its] own brand of industrial justice." *Garvey*, 532 U.S. at 509.[1]

Local 89 also argues in its response to the motion to dismiss that NATJAC exceeded its authority by determining that future hauls would be considered "new business" because the grievances filed by the union concerned only back pay for loads already hauled by Jack Cooper employees. However, despite Local 89's attempt to slice the issue solely into one of back pay and future pay, its second amended complaint states that it presented the issue to NATJAC in a different manner. Specifically, Local 89 alleged in the second amended complaint:

> At each and every step within the grievance machinery, Local 89 asserted that the hauls in question were not new business because the employees had hauled that same traffic since on or around December 2009. Thus, the traffic in question had been handled by a Teamster represented employer for over one (1) year and during the term of the Agreement. By hauling the traffic in question since on or about December 2009, the employer is prohibited from classifying the traffic as "new business" pursuant to Article 22, Section 1.

(DN 30, Second Am. Comp. ¶ 18). That allegation indicates that Local 89 presented the question of whether the hauls in question could ever be considered "new business." And NATJAC's decision answered that question in the following manner: the hauls met the definition of "new business,"

---

[1] In its motion to dismiss, Jack Cooper cites to two prior NATJAC decisions, which Jack Cooper argues are consistent with the NATJAC decision at issue here and thus show that the arbitrators were construing the NMATA. Jack Cooper attaches those prior NATJAC decisions to its motion as Exhibits 2 and 3. The parties dispute whether this court may properly take judicial notice of those prior NATJAC decisions and consider them in determining a motion to dismiss. Local 89 urges that if the court considers those decisions, then it must convert the motion to one for summary judgment, in which case Local 89 asserts that it would be entitled to further discovery.
  However, the court need not resolve the parties' dispute as to whether it may take judicial notice of the NATJAC decisions because the court finds that consideration of those decisions is unnecessary in order for the court to determine that there is no basis for vacating the NATJAC award at issue here. Accordingly, the court will exclude those two prior decisions and resolve the motion to dismiss as set forth in the main text.

although Jack Cooper was forbidden from paying "new business" rates for hauls made prior to Jack Cooper's provision of proper notice of the "new business" to Local 89. Once that notice had been provided, which had occurred by the time NATJAC rendered its decision, Jack Cooper could implement the "new business" rates. To put it succinctly: NATJAC's decision that the hauls could thenceforth be considered "new business" was a direct determination of Local 89's argument that Jack Cooper was "prohibited from classifying the traffic as 'new business.'" Local 89's post-hoc argument that it was only contesting back pay and not future pay is thus contrary to its allegations and is insufficient to show that NATJAC reached out to determine an issue that was not before it.

Finally, having found that NATJAC was construing the NMATA in its decision and the decision was within the scope of its authority, the court notes that there is no indication in Local 89's second amended complaint that NATJAC's decision was a result of alleged fraud or a conflict of interest. Accordingly, there is no basis for judicial intervention. *Michigan Family Res.*, 475 F.3d at 753. Jack Cooper's motion to dismiss the second amended complaint will therefore be granted and this action will be dismissed with prejudice.

A separate order will issue in accordance with this opinion.

February 1, 2013

**Charles R. Simpson III, Senior Judge**
**United States District Court**